# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

**NO. 03-24-00386-CR**
**NO. 03-24-00387-CR**

---

**Edgar Barahona, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 403RD DISTRICT COURT OF TRAVIS COUNTY**
**NO. D-1-DC-24-904046, THE HONORABLE BRANDY MUELLER, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant Edgar Barahona challenges his convictions for two counts of murder. *See* Tex. Penal Code § 19.02(b). In seven issues, he contends that numerous jury charge errors caused him egregious harm. We affirm the trial court's judgments of conviction.

## BACKGROUND

Then-nineteen-year-old Barahona was arrested the day after he shot two individuals in the parking lot of a sports bar in Austin, Texas. He told Detective Danny Hernandez with the Austin Police Department that he shot them in defense of himself and the people he was with. He was there with his seventeen-year-old sister (Paola),[1] his friend "Fernando," and two "girls." The two men that he shot were Juan Carlos Loraco-Villatoro and

---

[1] Because Barahona and his sister share a last name, we will refer to his sister by her first name.

Heliodoro Arias-Flores. Loraco-Villatoro died at the scene and Arias-Flores died at the hospital. Barahona found out from watching the news the morning of his arrest that one of them had died but was informed by Detective Hernandez that the other had died. When Barahona was arrested, police officers found a handgun in the driver's side door compartment of his car. Barahona told Detective Hernandez that the gun belonged to Fernando and that it was the same gun he used to shoot the two men in the parking lot. He denied having his own gun with him and explained that he was not involved in any gang or street activity. Barahona told Detective Hernandez that the two men he shot were in a gang. Barahona told Detective Hernandez that the men jumped Fernando and were near his younger sister. He explained to the detective that he thought it was between his life or the two attacking men's lives, so he did what he had to do to protect his sister and himself. He stated that he retrieved his friend's gun from the center console of his own car and used it to shoot the two attackers. He stated that he then drove his friend and the two girls home and then went to a dance club with his sister. At the time of Barahona's arrest and during the interview, he was wearing a red jacket. At the end of the interview, the jacket was taken by the detective as evidence. A video recording of Barahona's statement made to Detective Hernandez was admitted at trial.

Text messages and videos that were shared in Barahona's friend group chat the night of the shooting were recovered from Barahona's phone and admitted into evidence. One of Barahona's friends texted the group chat, "Bet you won't shoot them," about thirty minutes prior to the shooting. A few minutes after the shooting, Barahona texted his friend group that he shot the two men after they tried to jump Fernando. After the group chat members expressed disbelief, Barahona told them to ask Fernando. Fernando left the group chat approximately thirty minutes later.

2

About an hour and a half after the shooting, Barahona recorded himself driving past the sports bar. He sent the video to his group chat along with the message, "Crime Scene." The video depicts police cars in the parking lot with their lights flashing and Barahona makes a noise that he testified was a silly laugh. About half an hour after that, he recorded videos of himself partying at the night club. He sent a text while at the night club that stated, "Chilling like if nothing happened." After he left the club, he drove back by the sports bar and recorded another video. In his group chat the next morning (before he was arrested), he was advised, "Be smart," and, "Any[one] could snitch on you."

Officer Thomas Castonguay was the responding officer on the scene. He testified that the shooting occurred at about 10:30 p.m. at night. He testified that Loraco-Villatoro had already died when he got there. He attempted life saving measures on Arias-Flores. He testified that he got to the scene very quickly and was responding to a 911 call made by Arias-Flores. A recording of that 911 call was played for the jury.

Hussein Al-Hasnawi testified that he was working as a security officer at the sports bar the night of the shooting. He testified that he conducted searches and pat downs at the entrance to enforce the bar's no-firearms policy. He testified that he was inside by the front entrance when he heard the shots in the parking lot. He testified that there were no fights inside or outside prior to the shooting but agreed on cross-examination that he would not have known if there was a fight prior to the shooting because he was inside.

Detective Michael Rhone testified that he was working as an off-duty uniformed officer at the sports bar the night of the shooting. He testified that he arrived on his shift at 9 p.m. and that nothing noticeable happened prior to the shooting. He explained that he was inside and that he did not patrol the parking lot, but that if there was a fight outside, he would

3

have been notified. He was not notified that night of any altercations; he was only notified of the gunshots.

Doctor Jennifer Dierksen testified that she is a deputy medical examiner with the Travis County Medical Examiner's Office. She testified that she performed the autopsy on the two victims. She testified that Loraco-Villatoro died from a gunshot wound that was caused by a bullet entering the back left side of his head and exiting the front right side of his forehead. She testified that Loraco-Villatoro tested positive for marijuana and cocaine, but she could not determine when the drugs had been taken or how he would have been behaving at the time of his death. On cross-examination she agreed that the cocaine was likely taken within twenty-four hours of his death.

Dr. Dierksen testified that Arias-Flores had been shot three times and died from the resulting injuries. One bullet entered his left lower back and another entered his right lower back. Those two entrance wounds did not have associated exit wounds. The third bullet entered the back of his upper-right arm and exited out his right armpit. She explained that there was a fourth entrance wound to his chest on his right side that she believed was a reentrance wound caused by the bullet that had gone through his arm and out his armpit. The toxicology report showed that Arias-Flores had a blood alcohol level of .09, which Dr. Dierksen testified meant he was intoxicated.

Dr. Dierksen testified that she looked for any injuries on the two victims' hands that would indicate that they were involved in a fight prior to their deaths—such as bruising or lacerations—and there were no signs of any such injuries on either of them. She agreed on cross-examination that it is possible for individuals who are used to fighting to throw one or two punches without injury to their hands.

4

Juan Daniel Garcia-Vazquez testified that he was at the sports bar the night of the shooting. He had gone with his cousin Alex Ruiz. At the time of the shooting, he was in his car about to leave. He sat in his car playing on his phone for about five minutes to let the car heat up. He testified that he did not hear or see anyone fighting or arguing in the parking lot. He heard two gunshots and ducked down for "a second to seconds." He testified that when he looked up, he saw a person in a red jacket with his arm outstretched and a pistol in his hand. He saw one of the victims on the ground—Loraco-Villatoro. Garcia-Vazquez testified that the shooter was about five feet away from him and about five meters—about sixteen feet—away from the victim on the ground. Garcia-Vazquez testified that the shooter then "fled" in a car. He testified that no one other than the shooter was around the car. Garcia-Vazquez heard the tires squeal as the car left "fast." Garcia-Vazquez stayed in the parking lot to speak with security. He testified that no one other than security or police approached Loraco-Villatoro after the shooting. He testified that he did not know either victim but that he had interacted with them inside the sports bar prior to the shooting because they were there as a group. He explained that his cousin knew one of them. Garcia-Vazquez recognized the shooter as one of his Facebook friends and showed Barahona's picture to the police and identified him as the shooter.

According to the testimony of the police, investigators, and security that responded to the scene, no weapons were found at the scene, including on or near either victim.

Paola testified that as she and her brother were leaving the sports bar, Fernando and the two girls were walking behind them. Barahona told her to get in the car because there were two men "coming at him." She testified that Barahona opened the car door for her, and she got into the front passenger seat. Barahona then moved to the driver's side of the car. She testified that she saw the two men attack Fernando next to her window. She explained that she

5

saw Loraco-Villatoro kick Fernando and hit him on the head or back. She saw Fernando fall to the ground. She thought "something was going to happen to" her so she locked her car door. She testified that there was no shouting or loud noises while this was happening. She explained that Loraco-Villatoro kicked and punched Fernando without saying anything. She testified that when she saw Fernando fall, she was afraid that her brother, herself, or one of the girls would be killed.

Paola testified that after attacking Fernando, the two men then moved around the back of the car and she heard one of the girls say, "ouch." The two men started moving towards Barahona. She heard at least two gunshots close together and then everyone—Fernando, Barahona, and the two girls—got into the car and Barahona drove away. She described Barahona's driving as not quick or slow, but regular or normal speed. She testified that she saw the two men running away through the car's side mirror. She thought they had not been shot because they were running. She testified that Barahona said nothing during the drive but that one of the girls stated that she had been hit by one of the men.

Paola admitted that she had not told the State's investigator about what she testified to witnessing when she was interviewed about the incident prior to the trial. She agreed that when she was previously interviewed, she had stated that she had not seen or heard anything during the incident because she was looking straight forward and that no one said anything during the car ride. When asked why her testimony was different, she stated that she was remembering in the moment while testifying because she was reliving it.

Paola testified that her brother drove Fernando home after the incident. She saw Fernando go into his apartment and come out carrying "a rifle [and] some smaller guns." As soon as she saw him, Barahona drove away. When asked by defense counsel what she thought

6

would have happened if her brother had not shot the two men, she testified, "[I]t could have been me, it could have been the two ladies, it could have been worse, my brother, or [Fernando]."[2]

Raunel Reynoso testified that his brother and Arias-Flores were best friends. He was living with Arias-Flores at the time of his death but was not at the sports bar that night. Reynoso testified that he was arrested sometime after the shooting for driving while intoxicated and was held in a jail cell next to Barahona. He testified that Barahona tapped on the wall between their cells and asked him if he was Arias-Flores's brother. Reynoso testified that Barahona told him that he did not mean to shoot Arias-Flores "[b]ut that he intentionally meant to shoot" Loraco-Villatoro. He testified that Barahona also told him that he had "beef with [Loraco-Villatoro] for a while, and [Barahona] did want to kill him." He testified that Barahona told him that Fernando should also be in jail with him for what happened that night. He testified that Barahona mentioned that his sister was with him that night but did not mention anything about Fernando being jumped.

Barahona testified that he went to the sports bar with Fernando. He saw Loraco-Villatoro, Arias-Flores, and Ruiz there. He testified that Loraco-Villatoro and three other men had tried to "jump" him at a club a couple weeks prior. He testified that he was not injured because he fought all four of them off by himself without any weapons. He also testified that Ruiz had threatened him prior to the day of the shooting. He testified that Ruiz pulled up in a truck in the parking lot of the sports bar and told Barahona to watch out because he knew people who could get him. Barahona testified that while he was inside the sports bar the day of the shooting, Loraco-Villatoro, Ruiz, and Arias-Flores were with a group of people and kept

---

[2] Paola testified that she knew Fernando by the name, "Tío" and never learned his or the two ladies' names.

7

looking at him and telling secrets, but he could not hear what the group was discussing. He testified that based on his history with Loraco-Villatoro and Ruiz, he thought they were "plotting a hit" against him, which he explained meant they were going to pay someone to kill him. Barahona testified that he knew that Loraco-Villatoro and Arias-Flores were gang members because they wore blue and made a "C" shape with their hands. He testified that they enjoyed beating people up together and had been to prison. However, he also testified that he left the sports bar to go pick up his sister and came back with her, and that he would not have done that if he thought there was any danger.

He testified that when his group decided to leave, he was walking to his car with his sister and heard "somebody hit somebody." He turned around and saw Fernando "get dropped by Loraco-Villatoro." He explained that Fernando went down hard and had a busted lip. Barahona testified that he was scared and grabbed Fernando's gun from the center console. He then went around the car, opened the door for his sister, told her to get inside the car, and she did. He then saw that Fernando was on the ground and then he fired the shots. He also testified that Arias-Flores was running at him while reaching into his waistband. He testified that he was only shooting at them to scare them. He testified that he put the gun back in the center console and then drove away.

During cross examination, photographs, videos, and text messages from Barahona's phone were admitted into evidence. Many of them depicted Barahona posing with multiple types of firearms in different locations. In some of them he was making gestures with his hands. He testified that the guns were not his and that the hand gesture was not a gang sign. He explained that he was forming a two and a three with his hands to demonstrate which part of town he was from. He stated he "was throwing a sign" but it was an "area code sign" and "not a

8

gang sign," which he stated are different.  In a text thread from the day after the shooting between Barahona and his girlfriend, the two of them discussed a social media post that was posted by the mother of Arias-Flores's young child.  The post was about the child having to live without her father.  In the text thread, Barahona and his girlfriend made jokes and replied with laughing reactions to each other while discussing the post.  Barahona explained that they were not laughing because he was dead but were laughing because the couple had broken up a long time ago and also because sometime in the past his girlfriend had beaten up the woman who made the post.

After hearing all the evidence, the jury found Barahona guilty of murder and assessed punishment at thirty-five years' imprisonment for each count.  The trial court pronounced the sentences to run concurrently.  Barahona raises seven issues on appeal, all regarding the jury charge.

## RELEVANT LAW

The trial court is required to give the jury a written charge "setting forth the law applicable to the case; not expressing any opinion as to the weight of the evidence, not summing up the testimony, discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury." Tex. Code Crim. Proc. art. 36.14.  Jury-charge-error claims are reviewed under a two-pronged test in which the appellate court must determine: (1) whether the charge was erroneous, and (2) if there was an error, whether the error was harmful to the defendant.  *Olivas v. State*, 202 S.W.3d 137, 143–44 (Tex. Crim. App. 2006); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g).  If we conclude

that there was no trial-court error, we will not analyze harm regarding that issue. *See* Tex. R. App. P. 47.1.

The harm-analysis prong depends on whether a complaint regarding that error was preserved in the trial court. *Torres v. State*, 691 S.W.3d 138, 147 (Tex. App.—Austin 2024, pet. ref'd)). If no objection was made, as in this case, a reversal is warranted only if the error resulted in egregious harm. *See Neal v. State*, 256 S.W.3d 264, 278 (Tex. Crim. App. 2008). "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016). When no proper objection was made at trial, we will only reverse if the error was "fundamental"—that is, "it was so egregious and created such harm that the defendant was deprived of a fair and impartial trial." *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015).

## MULTIPLE ASSAILANTS INSTRUCTION

In his first issue, Barahona contends that the trial court erred when it included the words "acting together to attack him" in its multiple assailants jury instruction regarding the self-defense justification. The relevant instruction states:

> If a person reasonably believes he is threatened with the use or attempted use of unlawful force against him by several others, all present and acting together to attack him, and he has a right under the law set out above to use force against at least one of them, he may use force against any or all of them.

The relevant application paragraph regarding the murder of Loraco-Villatoro states:

> To decide the issue of self-defense, you must determine whether the state has proved, beyond a reasonable doubt, one of the following:

10

1. The defendant did not believe his conduct was immediately necessary to protect himself against:

   a. Juan Carlos (aka "Sleepy") Loraco-Villatoro's use or attempted use of unlawful deadly force or imminent commission of murder; or

   b. If Juan Carlos (aka "Sleepy") Loraco-Villatoro and Heliodoro (aka "Dodo") Arias-Flores were both present and acting together to attack the defendant, Heliodoro Arias-Flores's use or attempted use of unlawful deadly force or imminent commission of murder; or

2. The defendant's belief was not reasonable

The application section regarding Arias-Flores tracked the language of the instruction above, except with the names switched. In his second issue, Barahona raises the same grounds as in his first issue, but regarding the multiple assailants instruction for the defense of a third person. Specifically, he contends that the trial court erred when it instructed the jurors that in order to find that Barahona's actions against either assailant were justified by defense of a third person, they must find that the two assailants "were both present and acting together to attack" one of the other people in Barahona's group that day.

A defendant is entitled to a multiple assailants instruction when the evidence viewed from the defendant's standpoint shows an attack or threatened attack by more than one assailant. *Frank v. State*, 688 S.W.2d 863, 868 (Tex. Crim. App. 1985). It is not limited to those who are themselves aggressors, but also to those who are encouraging, aiding, or advising the aggressor. *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020). The "multiple assailants" requirement "does not require evidence that each person defended against was an aggressor in his own right; it requires evidence that the defendant had a reasonable fear of serious bodily injury from a group of people acting together." *Id.* at 344. When a defendant is entitled to a multiple assailant instruction, it is error for the charge to "unduly restrict the jury's

11

assessment of the facts vis a vis the law of self-defense." *Brown v. State*, 651 S.W.2d 782, 784 (Tex. Crim. App. 1983) (holding that when "there is evidence that more than one person attacked the defendant, the charge is too restrictive if it confines the right of self-defense to the acts of" only one of them).

Barahona contends that the inclusion of "all present and acting together to attack him" misstated the law and required the jury to find that both decedents were aggressors in their own right in order for his self-defense or defense-of-others theories to be considered by the jury, contrary to the holding in *Jordan*. However, the issue analyzed in *Jordan* was whether the defendant was entitled to a multiple assailant instruction and not the specific wording of the instruction. *See Jordan*, 593 S.W.3d at 343; Comm. on Pattern Jury Charges, State Bar of Tex., Texas Criminal Pattern Jury Charges: Justification Defenses CPJC 9.9 (2026) (explaining that Committee did not choose multiple assailant instruction "applying the language from *Jordan*, because *Jordan* did not purport to change the law regarding the language of a multiple-assailants instruction and because the language of a multiple-assailants instruction was not before the court in *Jordan*").

Barahona contends that the instruction directed the jurors to find in favor of Barahona's self-defense or defense-of-others theories only if they found that both men were acting as aggressors to attack him or another person in the group rather than acting together for one of them to attack. We disagree. The trial court's instruction directed the jury that self defense was available if the two men were acting together to attack him and if they were, then Barahona was justified in defending against either of them. No part of the jury charge instructed the jury that both men had to be aggressors in their own right in order to work together to attack

him.  Thus, contrary to Barahona's contention, the trial court's multiple assailant instruction did not improperly restrict his right to self-defense.  We overrule his first and second issues.

## PROVOCATION INSTRUCTION

In his third issue on appeal, Barahona contends that the trial court incorrectly instructed the jury not to presume his use of deadly force was reasonable if he provoked the attack, because provocation was not raised by the evidence.

A jury instruction on provoking the difficulty is required when there is sufficient evidence: (1) "that the defendant did some act or used some words which provoked the attack on him," (2) "that such act or words were reasonably calculated to provoke the attack," and (3) "that the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon the other." *Smith v. State*, 965 S.W.2d 509, 513 (Tex. Crim. App. 1998); *see also Elizondo v. State*, 487 S.W.3d 185, 197 (Tex. Crim. App. 2016).  However, such instruction is a limitation on a defendant's right to self-defense. *Elizondo*, 487 S.W.3d at 197.  Thus, "[i]f the facts do not support giving the charge on provoking the difficulty (i.e., a rational jury could not find all three elements of provocation beyond a reasonable doubt), then the provocation instruction must not be submitted to the jury," because "[i]ncluding it in the jury charge would constitute an unwarranted limitation on the right of self-defense, i.e., trial court error." *Id.*  All three *Smith* elements are questions of fact. *Smith*, 965 S.W.2d at 513.  We review the evidence "in the light most favorable to giving the instruction" and determine whether there was sufficient evidence from which a rational jury could have found each element of provocation beyond a reasonable doubt. *Id.* at 514.  Each of

the three elements may be proved circumstantially. *Fink v. State*, 97 S.W.3d 739, 742 (Tex. App.—Austin 2003, pet. ref'd).

Here, viewing the evidence in the light most favorable to giving the instruction, there was circumstantial evidence presented that could support a reasonable inference that Barahona left and returned to the sports bar where he believed Loraco-Villatoro and Arias-Flores were planning a hit on him, with a gun in his car, in order to provoke them into following him into the parking lot for the purpose and with the intent to have a pretext for shooting the two unarmed men. *See Fink*, 97 S.W.3d at 742–43 (concluding that provocation instruction was proper when defendant had successfully left presence of victim who was screaming at defendant, went to his own apartment, retrieved his weapon, and returned to where victim was before shooting unarmed victim).

There is sufficient evidence for the jury to infer that Barahona's act of leaving the sports bar and returning armed provoked the attack on him, satisfying the first *Smith* element. Barahona's own testimony establishes that he left and returned with a gun in his car to a place where he knew men that he had previous violent or threatening encounters with and that he thought were planning a hit on him were patronizing. There is also sufficient evidence supporting the second element. The jurors could have believed that the act was reasonably calculated to provoke the attack based on Barahona's testimony of the men's violent reputation, his personal history with Loraco-Villatoro, Ruiz's threat to send the two men after him, and his belief that they were planning a hit on him that night. Regarding the third element, in light of the text from his friend betting him he would not shoot "them" and Reynoso's testimony that Barahona told him that he wanted to kill Loraco-Villatoro because they had "beef," the jury

14

could have inferred that he returned to their location with a gun for the purpose and with the intent to have a pretext for shooting and killing them.

We conclude that it was not error to include the instruction because "a rational jury could find every element of provocation beyond a reasonable doubt." *Elizondo*, 487 S.W.3d at 197; *see Fink*, 97 S.W.3d at 742–43. We overrule Barahona's third issue.

## ENGAGED IN CRIMINAL ACTIVITY INSTRUCTION

In his fourth issue on appeal, Barahona contends that the trial court incorrectly instructed the jury not to presume his use of deadly force was reasonable if he was "otherwise engaged in criminal activity," because he contends that issue was not raised by the evidence. In his fifth issue on appeal, he contends that the trial court improperly commented on the weight of the evidence by instructing the jury regarding the elements of the offense of Unlawful Carrying of Weapons, Tex. Penal Code § 46.02, because he contends that the evidence did not raise an enforceable violation of Section 46.02. Because unlawful carrying of a weapon is the criminal conduct relevant to Barahona's fourth issue as well, we will address these two issues together— as Barahona did in his appellate brief. The relevant sections from the jury charge state:

> [Y]ou must find the defendant's belief that the deadly force he used was immediately necessary was reasonable unless you find the state has proved, beyond a reasonable doubt . . . [that] the defendant, at the time the deadly force was used, was engaged in criminal activity, other than a Class C misdemeanor.
>
> . . . .
>
> A person can commit the offense of Unlawful Carrying of Weapons in two ways. First, a person commits Unlawful Carrying of Weapons if the person (1) intentionally, knowingly, or recklessly carries on or about his person a handgun; (2) at the time of the offense is younger than 21 years of age; and (3) is not (A) on the person's own premises or premises under the person's control; or

15

(B) inside of or directly en route to a motor vehicle that is owned by the person or under the persons control. Second, a person commits Unlawful Carrying of Weapons if the person carries a handgun and intentionally displays the handgun in plain view of another person in a public place.

A person's conduct that would otherwise constitute the crime of Unlawful Carrying of a Weapon is not a criminal offense if both 1) the person reasonably believed the conduct was immediately necessary to avoid imminent harm, and 2) the desirability and urgency of avoiding the harm clearly outweighed, according to ordinary standards of reasonableness, the harm sought to be prevented by the law prohibiting the conduct constituting the crime.

The offense of Unlawful Carrying of Weapons is a Class A misdemeanor.

This instruction includes language tracking the statute on unlawful carrying of weapons. *See* Tex. Penal Code § 46.02. The statute includes multiple ways the offense may be committed. The State's theory at trial, and the matching jury instruction, was based on two of those ways. Subsection (a)(2)(A) provides that a person commits an offense if the person intentionally, knowingly, or recklessly carries on or about his or her person a handgun and is younger than twenty-one years of age. Subsection (a-5) provides that "[a] person commits an offense if the person carries a handgun and intentionally displays the handgun in plain view of another person in a public place" unless it is carried in a holster. Barahona contends that this instruction was improper because there was no evidence of criminal activity for two[3] reasons: (1) he contends that Subsection (a)(2)(A) is unconstitutional; and (2) he contends that the act of drawing and aiming a gun as part of defending oneself or others cannot be used as evidence of the commission of unlawful carrying a weapon under Subsection (a-5).

---

[3] Barahona also contends that "because the trial court erred to include the 'otherwise engaged in criminal activity' in its Sec. 9.32(b) instruction, the trial court also erred to include language relating to Sec. 46.02." Because resolving this ground in his favor is contingent on us resolving at least one of his other two grounds in his favor, and we have not, we do not address this third ground. *See* Tex. R. App. P. 47.1.

16

We first address Barahona's contention that subsection (a)(2)(A), which limits the lawful carry of a handgun when a person is under twenty-one years of age, is unconstitutional. Notably, Barahona did not challenge the constitutionality of the statute in the trial court and does not raise a standalone constitutional challenge here. Rather, he contends that the subsection has been determined unconstitutional by the Supreme Court of the United States, *see New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and a federal Texas court, *see Firearms Policy Coal., Inc. v. McCraw*, 623 F. Supp. 3d 740 (N.D. Tex. 2022). However, the Supreme Court's *Bruen* opinion does not address Section 46.02, or any other Texas law, but rather was a civil case reviewing a New York licensing statute. *See Bruen*, 597 U.S. at 11.

The Federal District Court's opinion in *McCraw* "order[ed] that: To the extent that Texas's statutory scheme, Tex. Penal Code § 46.02(a) and Tex. Gov't Code §§ 411.172(a)(2), (g), (h), (i), prohibits law-abiding 18-to-20-year-olds from carrying handguns for self-defense outside the home based solely on their age, this statutory scheme violates the Second Amendment, as incorporated against the States via the Fourteenth Amendment." *McCraw*, 623 F. Supp. 3d. at 758. However, "state courts are not bound by decisions of the lower federal courts." *Gutierrez v. State*, 663 S.W.3d 128, 131 (Tex. Crim. App. 2022). Further, unlike here, *McCraw* was not a criminal proceeding and it focused on licensing issues. *Id.* at 753 ("Plaintiffs seek to enjoin only provisions that prohibit them from applying for a license to carry a handgun."); *id.* at 756 ("The Court therefore enjoins the Texas laws to the extent they prohibit law-abiding 18-to-20-year-olds from applying for a license to carry a handgun.").

"Statutes are presumed to be constitutional until it is determined otherwise." *Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009). In a concurring opinion from the Texas Court of Criminal Appeals regarding a dismissal of a petition raising the issue of the

17

constitutionality of Section 46.02 that was released after the *Bruen* and *McCraw* opinions, Justice Parker explained that the presumption of constitutionality of Section 46.02 still applies. *See Salas-Martinez v. State*, 730 S.W.3d 456, 458 (Tex. Crim. App. 2026). We conclude that the presumption of constitutionality still applies to Section 46.02. Thus, we cannot conclude that the trial court erred by including the criminal conduct and Section 46.02 instructions in the context of a criminal proceeding and regarding the presumption of reasonableness of a self-defense theory. *See Salas-Martinez*, 730 S.W.3d at 458 (explaining that dismissal of petition was proper because "the failure to challenge the statute at trial means the presumption of constitutionality remains unrebutted, and, if the instruction conforms to the statute and is otherwise applicable to the case, no error can be shown"); *Karenev*, 281 S.W.3d at 434 (explaining that "[t]he State and the trial court should not be required to anticipate that a statute may later be held to be unconstitutional").

Next, we address Barahona's contention that there was no evidence that he displayed the gun in public because he was acting in self-defense. The State argued at trial that the moment that Barahona grabbed the gun from the console until he fired the gun, he was displaying it in in plain view of another person in a public place in violation of subsection (a-5). *See* Tex. Penal Code § 46.02 (a-5). Barahona contends that he did not unlawfully display a handgun when he raised the gun to shoot at the decedents in self-defense because such an interpretation of the statute would be "an absurd result the Legislature never could have intended" because it would require people to only shoot firearms from their pockets when defending themselves. We disagree with his assertion that under the interpretation argued by the State that the only way a person can lawfully defend themselves with a firearm would be to fire it concealed within their pocket because the defense of necessity applies to the offense of unlawful

18

carrying of a weapon. *See Johnson v. State,* 650 S.W.2d 414, 416 (Tex. Crim. App. 1983), *overruled on other grounds by Boget v. State*, 74 S.W.3d 23 (Tex. Crim. App. 2002) (holding that defense of necessity is available in prosecutions under Sec. 46.02). The trial court included the necessity instruction. We decline to conclude that interpreting the statute to prohibit the display of a firearm in public unless done out of necessity is an absurd interpretation that could not have been the legislature's intent. On the contrary, the statute demonstrates a legislative intent to limit the public display and carrying of firearms in certain circumstances absent necessity.[4]

Barahona also contends that there was no evidence of him displaying a gun in public because displaying and discharging the gun should be viewed as a single event. Barahona relies on *Pham v. State*, 639 S.W.3d 708, 713 (Tex. Crim. App. 2022). In *Pham*, the defendant was convicted of murder and complained on appeal that the jury should have been instructed on threat of deadly force pursuant to Section 9.04 of the Texas Penal Code. That section provides that a "threat to cause death or serious bodily injury by the production of a weapon or otherwise, as long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute the use of deadly force." Tex. Penal Code § 9.04. In interpreting that statute, the Texas Court of Criminal Appeals held that Section 9.04 does not apply when the defendant goes beyond creating apprehension of using deadly force and uses it. *Pham*, 639 S.W.3d at 713. Contrary to Barahona's contention, the Court did not hold that

---

[4] The State's appellate brief asserts an alternative theory to support the inclusion of the Section 46.02 (a-5) instruction. The State contends that there was also evidence presented that Barahona did not retrieve the gun from his center console but was carrying the gun in his waistband while in the sports bar and parking lot. Because we conclude that the interpretation of the statute is not absurd as applied to the theory that the gun was retrieved from the console, we do not address the State's alternative theory that the gun was retrieved, and displayed, from Barahona's waistband.

19

displaying a gun and discharging a gun are always one singular event. Rather, the Court interpreted the meaning of Section 9.04 based on its plain language which does not apply here. *See id.*

We conclude that the trial court's inclusion of the criminal conduct and Section 46.02 instructions was not error. We overrule Barahona's fourth and fifth issues.

## JAILHOUSE INFORMANT INSTRUCTION

In his sixth issue, Barahona contends that the trial court erred when it did not include a jury instruction on the law relating to jailhouse informant testimony. Article 38.075(a) requires the presence of corroborating evidence when a jailhouse witness testifies about a statement made by the defendant that was against the defendant's interest and made while both the witness and defendant were imprisoned together. *Phillips v. State*, 463 S.W.3d 59, 67 (Tex. Crim. App. 2015); *see* Tex. Code Crim. Proc. art. 38.075(a). Here, Reynoso testified that while he was incarcerated alongside Barahona, he had a conversation with Barahona, which included statements against Barahona's interest. Specifically, that he intentionally shot Loraco-Villatoro and wanted to kill him because of a beef between the two of them. The State concedes that a jailhouse witness instruction should have been given in this case. It was trial court error to not include the applicable instruction in the jury charge. *See Phillips*, 463 S.W.3d at 68 (holding that trial court erred when it did not include applicable Article 38.075(a) instruction in jury charge). Because there was no objection to the omission of this instruction from the charge, we must now determine whether the error egregiously harmed Barahona. *See Almanza*, 686 S.W.2d at 174.

"[T]he existence of corroborating evidence 'tending to connect' appellant to the offense can 'render harmless' the trial court's failure to submit an article 38.075 instruction by

20

fulfilling the purpose that such an instruction is designed to serve." *Brooks v. State*, 357 S.W.3d 777, 781–82 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd); *cf. Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002) (explaining that "[u]nder the egregious harm standard, the omission of an accomplice witness instruction is generally harmless unless the corroborating (non-accomplice) evidence is 'so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive'" (quoting *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991))).

Barahona contends that the general harmless error rule should not apply "when the defendant's sole defense is justification, and the inmate testimony is the only witness testimony challenging the defendant's version of events." However, Article 38.075 requires that jailhouse witness testimony be "corroborated by other evidence tending to connect the defendant with the offense committed." Tex. Code Crim. Proc. art. 38.075(a). It does not require that there be corroborating evidence regarding a lack of justification for the offense.

Here, there was significant corroborating evidence to connect Barahona to the two murders. Barahona admitted as part of his self-defense theory to shooting at the two victims. Garcia-Vazquez testified that he was in the parking lot during the shooting and saw Barahona with a gun in his outstretched hand and Loraco-Villatoro on the ground. *See Smith v. State*, 332 S.W.3d 425, 443 (Tex. Crim. App. 2011) (holding that proof that defendant "was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction"). Further, even if corroboration regarding the lack of justification was required, the medical examiner testified that there were no wounds on either

21

victim's hands indicating that they were not involved in a fight before their deaths, which contradicted Barahona's testimony that he shot them because they were beating up Fernando.

Because there was corroborating evidence, we conclude that the erroneous exclusion of the jailhouse witness instruction did not egregiously harm Barahona. *See Martinez v. State*, 662 S.W.3d 496, 501 (Tex. App.—San Antonio 2018, pet. ref'd) (concluding that "the trial court's failure to give an article 38.075 jailhouse-witness instruction did not egregiously harm" defendant when there was "sufficient corroborating evidence tending to connect [Defendant] to [victim's] murder"). We overrule Barahona's sixth issue.

## CUMULATIVE HARM

In his final issue on appeal, Barahona contends that the cumulative effect of his asserted jury charge errors harmed him. Cumulative harm occurs when the cumulative effect of multiple errors rendered the trial "fundamentally unfair." *Estrada v. State*, 313 S.W.3d 274, 311 (Tex. Crim. App. 2010). "Though it is possible for a number of errors to cumulatively rise to the point where they become harmful, we have never found that non-errors may in their cumulative effect cause error." *Bluntson v. State*, 728 S.W.3d 87, 117 (Tex. Crim. App. 2025) (citation modified). Because we determined above that the sole charge error—the lack of a jailhouse witness instruction—was not harmful, we cannot conclude that the error in combination with the non-errors identified by Barahona caused cumulative egregious harm or rendered his trial fundamentally unfair. *See Love v. State*, 706 S.W.3d 584, 612 (Tex. App.—Austin 2024, pet. ref'd) (concluding that there was not cumulative harm when court determined that only one asserted error was error and it was not harmful). We overrule Barahona's final issue.

22

**CONCLUSION**

We affirm the trial court's judgments of conviction.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Theofanis and Crump

Affirmed

Filed:   June 30, 2026

Do Not Publish